**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| RAVGEN, INC.,<br>              Plaintiff,<br>    v.<br>ARIOSA DIAGNOSTICS, INC.,<br>ROCHE SEQUENCING SOLUTIONS, INC.,<br>ROCHE MOLECULAR SYSTEMS, INC., and<br>FOUNDATION MEDICINE, INC.,<br>              Defendants. | C.A. No. 20-cv-1646-RGA-JLH<br><br>**JURY TRIAL DEMANDED** |
| RAVGEN, INC.,<br>              Plaintiff,<br>    v.<br>MYRIAD GENETICS, INC., and<br>MYRIAD WOMEN'S HEALTH, INC.,<br>              Defendants. | C.A. No. 20-cv-1730-RGA-JLH<br><br>**JURY TRIAL DEMANDED** |
| RAVGEN, INC.,<br>              Plaintiff,<br>    v.<br>BIORA THERAPEUTICS, INC.,<br>              Defendant. | C.A. No. 20-cv-1734-RGA-JLH<br><br>**JURY TRIAL DEMANDED** |

**DEFENDANTS' MOTION TO SET AN INEQUITABLE CONDUCT TRIAL**

Now that the issue of inequitable conduct has been added to the case, Defendants respectfully request that—as Judge Klausner of the Central District of California did when presented with the same evidence of Ravgen's inequitable conduct in another one of Ravgen's cases—the Court schedule a one-day trial on inequitable conduct for early next year, ahead of any jury trials on infringement and validity. *See* Ex. 1, *Ravgen, Inc. v. Quest Diagnostics Incorporated*, No. 21-9011-RGK-GJS (C.D. Cal. Sept. 30, 2022) ("*Quest*"), D.I. 453 at 1-2.[1]

## I. INTRODUCTION

Indisputable evidence shows that Ravgen obtained the two asserted patents by knowingly withholding highly material information from the Patent Office. Specifically, Ravgen CEO and named inventor, Dr. Dhallan, and his in-house attorney, Dr. Cronin, persuaded the Patent Office to grant the patents only by arguing that Dr. Dhallan's experimental test results demonstrated the supposed "unexpected results" of the claimed invention. At the same time they were making that argument, they were indisputably aware that multiple leading laboratories and scientists had criticized the credibility and accuracy of those experimental test results in published articles and letters, including because of "***signs of inaccuracy, skewed data distribution, and analytical imprecision***." Ex. 3 [Chung] at 657.[2] But they inexplicably failed to disclose any of those journal articles and letters to the Patent Office in violation of 37 CFR § 1.56(b) (requiring disclosure of information that "is ***inconsistent with***, a position the applicant takes in … [a]sserting an argument of patentability"). The Patent Office then allowed the claims of Ravgen's patents while specifically citing Ravgen's discredited test results arguments as the "***most persuasive arguments***" submitted during prosecution.

---

[1] Ravgen then almost immediately settled with Quest. *See* Ex. 2, *Quest*, D.I. 492.
[2] All emphases are added unless otherwise indicated.

When presented with this same evidence in another case, Judge Klausner of the Central District of California scheduled a bench trial on inequitable conduct ahead of a jury trial on the issues of infringement and validity. That bench trial was never held because Ravgen settled the case and dismissed its claims shortly after the Court's ruling. But it demonstrates the seriousness of the evidence. Judicial economy warrants doing the same here. The inequitable conduct issues are case dispositive, could be addressed in a single ***one-day*** bench trial, and could eliminate the need to conduct ***four separate jury trials***. *See* Ex. 4, Am. Sched. Order at 1-2, *Robocast Inc. v. Apple Inc.*, No. 11-235-RGA (D. Del. May 27, 2014), D.I. 480 ("*Robocast*") (inequitable conduct trial set ahead of merits trial as "it [wa]s most efficient …, even if there [wa]s some chance that, in hindsight, it w[ould] not have been necessary"). Accordingly, Defendants respectfully request that the Court schedule trial on inequitable conduct ahead of any jury trials.

## II.    RELEVANT FACTUAL BACKGROUND

### A.    Indisputable Evidence Demonstrates That Ravgen Obtained The Asserted Patents Through Inequitable Conduct.

During prosecution of the two asserted patents, the Patent Office rejected numerous proposed claims stating that, "***absent an unexpected result, [the claims] would have been prima facie obvious***." *See, e.g.*, Ex. 5 [Jan. 30, 2007 Office Action ('277 patent)] at 50-52; Ex. 6 [June 15, 2007 Office Action ('720 patent)] at 8. Ravgen responded to the obviousness rejections by presenting its test results that it argued showed significant and unexpected results. For example, during prosecution of the '277 patent, Ravgen cited its experimental test data in Examples 4 and 15 of the specification and argued that "the amounts of fetal DNA isolated from maternal blood samples were significantly, ***and <u>unexpectedly</u>***, higher for samples treated with" Ravgen's technique; contended that its experiments showed "the percentage of fetal DNA present in the sample without formalin [i.e., aqueous formaldehyde] was 1.56%, whereas the percentage of fetal

DNA in the sample treated with formalin was 25%;" and argued that "the methods encompassed within" the rejected claims "***produce unexpected results***, and therefore … would not have been obvious." Ex. 7 [May 30, 2007 Amendment ('277 patent)] at 36; *see also* Ex. 8 [May 17, 2007 Interview Summary ('277 patent)] at 2 (noting "particular claims and claim limitations were discussed in an effort to identify limitations/***unexpected results which would obviate the outstanding obviousness rejections***").

Following Ravgen's "unexpected results" argument, the Patent Office reversed its rejection and allowed the claims of Ravgen's '277 patent, specifically citing to Ravgen's unexpected results arguments. Ex. 9 [Sept. 26, 2007 Notice of Allowance ('277 patent)] at 2 (finding claims allowable). The same occurred during prosecution of the '720 patent. *See, e.g.*, Ex. 10 [Dec. 17, 2007 Amendment ('720 patent)] at 14 (arguing significant and unexpected results); Ex. 11 [March 14, 2008 Office Action ('720 patent)] at 2 (finding claims allowable); Ex. 12 [June 2, 2009 Amendment ('720 patent)] at 12 (after a later rejection, again arguing unexpected results); Ex. 13 [Sept. 11, 2009 Office Action] at 2 (allowing claims). In fact, in the '720 prosecution, the Examiner noted that Ravgen's "unexpected results" arguments were the "***most persuasive arguments***" submitted. Ex. 11 [March 14, 2008 Office Action ('720 patent)] at 2. And Ravgen has admitted that its unexpected results arguments were critical to allowance of ***both*** patents. Ex. 14 [Ravgen '277 patent POPR] at 1 ("After raising several obviousness rejections, the Patent Office allowed the '277 patent after [Ravgen] submitted evidence of long-felt need and unexpected results, which the Examiner considered during prosecution of the '277 patent and characterized ***as '[t]he most persuasive arguments'*** during prosecution of the related '720 patent'"); Ex. 15 [Ravgen '720 patent POPR] at 1 (similar).

But at the same time that they were relying on these supposedly "significant and

3

unexpected" test results to persuade the Examiner to grant the asserted patents, Drs. Dhallan and Cronin were indisputably aware that multiple well-known scientists had criticized the accuracy and credibility of their test results in published journal articles and letters. Just by way of example:

- In a March 2005 article, Dr. Chinnapapagari, Dr. Holzgreve, and three other scientists—some of the leading scientists in the field—concluded after conducting their own experiments that the data "***do not support the report by Dhallan*** et al." Ex. 16 [Chinnapapagari] at 654. Specifically, after conducting their own testing of Dr. Dhallan's method, they concluded that formaldehyde "[d]oes [n]ot [a]lter the [p]roportion of [c]irculatory [f]etal [n]ucleic [a]cids (DNA and mRNA) in maternal plasma" and that "[f]etal DNA … concentrations were ***unaffected by formaldehyde treatment as described by Dhallan***." *Id*. at 652-654.

- In another March 2005 article, Dr. Chung and five other scientists—again some of the leaders in the field—concluded that Dr. Dhallan's test results were seriously flawed and found again, directly contrary to Dr. Dhallan's results, that formaldehyde did ***not*** significantly affect the concentration of free fetal DNA in blood samples. Ex. 3 [Chung]. Dr. Chung found that the results of her validation study "contrasted markedly with the extent of fetal DNA enrichment reported previously" by Dr. Dhallan. *Id*. at 657-658. Dr. Chung concluded that Dr. Dhallan's method of measuring the amount of fetal DNA was flawed including because of "***signs of inaccuracy, skewed data distribution, and analytical imprecision***." *Id.* at 657.

- Following these journal articles, and still during prosecution of both asserted patents, multiple scientists expressed concerns—both directly to Ravgen and in letters to the medical community that Dr. Dhallan received—about Dr. Dhallan's experimental test results and his failure to address the "controversy" surrounding those results. For example, in July 2006, The New England Journal of Medicine refused to publish a manuscript submitted by Drs. Dhallan and

4

Cronin that relied upon Dr. Dhallan's experimental test results, with one peer reviewer *explicitly faulting Dr. Dhallan for "not mention[ing] this important controversy" in the newly submitted manuscript*. Ex. 17 [RAVGEN-QUEST-00201140] at -1141.  Dr. Dhallan was aware of these comments and emailed Dr. Cronin about them.  Ex. 18 [RAVGEN-QUEST-00201139] at -1139.

- In March 2007, Drs. Dhallan and Cronin received *three* letters to the editor of the Lancet, all responding to a paper that Drs. Dhallan and Cronin published in that journal.  Ex. 19 [RAVGEN-QUEST-00206926].  Each letter criticized Ravgen for failing to disclose the Chinnapapagari and Chung articles and failing to address the "controversy" surrounding Ravgen's formaldehyde claims.  *Id*.  Each letter—along with Dr. Dhallan's response—was subsequently published in the Lancet.  Ex. 20 [Published Lancet Letters].

Ravgen claims that an article by Benachi demonstrates that its method works.  In fact, even that article observed that Ravgen's experiments "had no control group," that Ravgen compared its results with those obtained using a "different methodology" and samples that likely had "different … absolute amount[s] of fetal DNA;" and that "some issues still need to be addressed" with Ravgen's claims, "especially the reason for the variability in results."  Ex. 21 [Benachi] at 244.

Despite their awareness of this nearly universal criticism of Dr. Dhallan's test results, it is undisputed that Drs. Dhallan and Cronin failed to disclose Chinnapapagari, Chung, or any discussion of the "controversy" to the Patent Office.  Instead, they continued to argue—*even in an in-person interview sitting across the table from the Examiner*—that Dr. Dhallan's supposedly "unexpected" experimental test results warranted granting their patents without ever even mentioning the mountain of data that directly contradicted their arguments.[3]

---

[3] The evidence also shows that Ravgen manipulated the data in the specification of the asserted patents.  The specifications state that Ravgen's formaldehyde technique resulted in fetal DNA

5

### B. Based On This Same Evidence, Another Court Scheduled A Bench Trial On Inequitable Conduct Ahead Of Any Jury Trial On The Patent Issues.

While this case was stayed, Ravgen's case against Quest Diagnostics Incorporated proceeded in CDCA before Judge R. Gary Klausner. In *Quest*, the defendant moved for summary judgment of inequitable conduct based on the same facts recited above. *See* Ex. 24, *Quest*, D.I. 260 at 8-18. Ravgen moved for summary judgement of no inequitable conduct. *See* Ex. 25, *Quest*, D.I. 264. The court denied the competing motions, but in doing so, observed that "Quest's evidence suggests the Examiner would have benefitted from knowing that like-minded people in the field faulted Dr. Dhallan for failing to address the 'controversy' between his results and the conflicting data." Ex. 26, *Quest*, D.I. 449 at 13-14. The court then set a bench trial on inequitable conduct ***before*** a jury trial on the patent merits issues. Ex. 1, *Quest*, D.I. 453 at 1-2. Ravgen almost immediately settled with Quest and dismissed its claims. Ex. 2, *Quest*, D.I. 492.

### C. With Inequitable Conduct In The Cases, This Issue Is Ripe For Consideration.

Defendants initially requested that the issue of inequitable conduct be addressed on a separate discovery schedule and set for trial in October 2023 as part of their proposed scheduling submission when the stay was lifted in these cases. *Biora*, D.I. 86. Ravgen opposed, arguing that no Defendant had yet pled inequitable conduct. Where inequitable conduct was not yet in the cases, the Court declined to set a separate schedule and early trial. All Defendants have now been

---

percentages of "***100%***" for 10 out of 69 samples. *See Ravgen, Inc. v. Biora Therapeutics, Inc.*, No. 20-cv-1734-RGA-JLH ("*Biora*"), D.I. 1 (Complaint), Ex. 1 ['277 patent] at Table XXI; D.I. 1 (Complaint), Ex. 2 ['720 patent] at Table XXI. But Ravgen has since admitted that it merely "***represented***" its results as 100% in the patent, but that it did ***not*** actually achieve 100%. Ex. 22 [LabCorp Brief] at 3 n.4 (admitting that the "the results for some samples were ***represented as 100% fetal DNA***, not that all (or any) of the free maternal DNA was removed"); Ex. 23 [*Markman* Hr'g Tr.] at 128:19-129:6 (Ravgen's counsel: ***"100 percent doesn't mean 100 percent"***). Despite relying on this data in its arguments, ***Ravgen never disclosed to the Examiner that it was merely "representing" values at 100%***. *See, e.g.*, Ex. 7 [May 30, 2007 Amendment ('277 patent)] at 36; Ex. 12 [June 2, 2009 Amendment ('720 patent)] at 12.

granted leave to amend and have added inequitable conduct defenses in each case. Defendants propose following the same discovery schedule that has been set, but setting an early trial on inequitable conduct so that four separate jury trials could potentially be avoided.

### III.     ARGUMENT

#### A.     The Evidence Is Overwhelming That The Patents-In-Suit Are Unenforceable.

A patent is unenforceable due to inequitable conduct where the patentee "omit[s] material information" during prosecution "with the specific intent to deceive the PTO" and/or "engage[s] in affirmative acts of egregious misconduct." *Therasense, Inc. v. Becton, Dickinson & Co.*, 649 F.3d 1276, 1285, 1287, 1292 (Fed. Cir. 2011) (*en banc*).

The materiality required to establish inequitable conduct is but-for materiality. *Id*. at 1287, 1291. "Unlike the clear and convincing evidence standard for invalidating a patent in the district court under 35 U.S.C. §§ 102 and 103, the standard for establishing but-for materiality in the inequitable conduct context only requires a preponderance of the evidence, 'giv[ing] claims their broadest reasonable construction.'" *Aventis Pharma S.A. v. Hospira, Inc.*, 675 F.3d 1324, 1334 (Fed. Cir. 2012) (quoting *Therasense*, 649 F.3d at 1291-92). It is not necessary to show a withheld reference would invalidate the patent claims in district court. *Id.* ("[E]ven if the withheld reference is not sufficient to invalidate the claim in district court, 'the reference may be material if it would have blocked patent issuance under the PTO's different evidentiary standards.'" (quoting *Therasense*, 649 F.3d at 1292)); *see also Am. Calcar, Inc. v. Am. Honda Motor Co.*, 651 F.3d 1318, 1335 (Fed. Cir. 2011). Nor does the standard require that the withheld reference be material to a "reasonable examiner." *Am. Calcar*, 651 F.3d at 1335 (vacating findings of materiality because the court evaluated materiality "based on the PTO's Rule 56 standard and the 'reasonable examiner' standard, both standards that we rejected in *Therasense*"). Rather, to assess materiality, "the court must determine **whether the PTO would have allowed the claim** if it had been aware of

7

the undisclosed reference." *Therasense*, 649 F.3d at 1291.

The evidence here is unequivocal that the withheld references were material. Because of Drs. Dhallan and Cronin's failure to disclose, the Examiner was unaware that Dr. Dhallan's test results—what he viewed as the "***most persuasive arguments***" and the basis for reversing his obviousness rejections—had been discredited by the scientific community. Indeed, confirming that those of skill in the art considered the undisclosed references material to an evaluation of Ravgen's claims, multiple scientists explicitly faulted Dr. Dhallan for failing to address the contradictory Chung and Chinnapapagari test results in his articles. *See, e.g.*, *Tawnsaura Grp., LLC v. Maximum Hum. Performance, LLC*, 2014 WL 10473254, at *12 (C.D. Cal. July 14, 2014) ("criticism [inventor] received from two journals" during prosecution was "material to the patentability of the '107 Patent"); Ex. 27, *Spectrum Sols. LLC v. Longhorn Vaccines & Diagnostics*, IPR2021-00847, Paper 107 at 31-32 (May 3, 2023) (patentee's selective withholding of material test results inconsistent with arguments it advanced violated the duty of candor).

The specific intent to deceive must be "the single most reasonable inference able to be drawn from the evidence." *Therasense*, 649 F.3d at 1290. Direct evidence of intent is not required but may instead be inferred, such as where an applicant "repeatedly makes factual representations contrary to the true information he had in his possession." *Regeneron Pharms., Inc. v. Merus N.V.*, 864 F.3d 1343, 1351 (Fed. Cir. 2017); *see Rohm & Haas Co. v. Crystal Chem. Co.*, 722 F.2d 1556, 1571 (Fed. Cir. 1983) (intent "may be proven by a showing of acts the natural consequences of which are presumably intended by the actor").

Drs. Dhallan and Cronin undisputedly knew of the Chinnapapagari and Chung articles, knew that at least 14 scientists in the field questioned Ravgen's claimed test results based on Chinnapapagari and Chung's contrary results, and knew that multiple scientists faulted them for

8

failing to acknowledge the "controversy" surrounding their experiments. *See supra* at 2-5. Despite this undisputed knowledge, and ***despite sitting across the table from the Examiner in an interview***, Drs. Dhallan and Cronin never once disclosed the contrary test results to the Examiner. Drs. Dhallan and Cronin have no reasonable explanation for this failure. The only reasonable inference is that they intended to withhold references that directly contradicted their key arguments for patentability. *See Am. Calcar, Inc. v. Am. Honda Motor Co.*, 768 F.3d 1185, 1191 (Fed. Cir. 2014) (most reasonable inference was intent to deceive where "failure to disclose other information [about prior art system] that would have prevented his patent application from succeeding 'demonstrates a deliberative process, not an accident or mistake'").[4]

### B. Judicial Economy Warrants Trial On Inequitable Conduct Ahead Of Any Jury Trials.

***First***, an early trial on inequitable conduct would potentially save very substantial judicial resources. A finding that Ravgen's patents were obtained through inequitable conduct would render all remaining patent issues moot. Under the current scheduling order, the first jury trial in these matters is scheduled to begin on or after October 28, 2024 (lasting five days), and then be followed by three other five-day jury trials. Scheduling a ***one-day*** inequitable conduct trial ahead of the jury trials could thus ***eliminate the need for twenty days of four separate jury trials***, saving very significant judicial and party resources.

Moreover, scheduling a one-day trial on inequitable conduct shortly after the end of expert

---

[4] Ravgen has asserted that the PTAB "rejected" Defendants' arguments regarding the Chinnapapagari and Chung articles in the *inter partes* review proceedings. That is wrong. Instead, the PTAB repeatedly and expressly stated that it did not even reach the secondary considerations arguments in which the Chinnapapagari and Chung articles were raised: "We ***need not reach these arguments*** because Petitioner's challenge to the claims fails for other reasons discussed herein." Ex. 28, IPR2021-01272, Paper 50 at 56 n.34; Ex. 29, IPR2021-01054, Paper 51 at 48 n. 31 ("***We need not reach Patent Owner's argument*** on secondary considerations of nonobviousness here."); Ex. 30, IPR2021-00902, Paper 55 at 48 n. 32 (same).

9

discovery (Feb. 16, 2024) could eliminate the need to proceed through *eight months* of briefing on dispositive/*Daubert* motions, motions *in limine*, and other pre-trial proceedings *in three cases*. *Biora*, D.I. 101; *see Armament Sys. & Procs., Inc. v. IQ Hong Kong, Ltd.*, 2007 WL 101230, at *6 (E.D. Wisc. Jan. 10, 2007) (setting early trial on inequitable conduct, citing potential for "significant savings of time and resources"). Courts in this district have scheduled trials on patent unenforceability ahead of jury trials on the merits in similar circumstances. *See, e.g.*, Ex. 4, *Robocast* at 1-2; Ex. 31, Tr. at 4:2-8, 7:9-15, *Koninklijke Philips N.V. v. Telit Wireless Sols., Inc.*, No. 20-1708-CFC (D. Del. Feb. 22, 2023), D.I. 120 (setting trial on unenforceability first "to streamline how to litigate this very complex case").

*Second*, Ravgen has already taken the position that inequitable conduct should be tried separately from the jury trials; the only question is *when* the trial should occur. Scheduling it before the jury trials will not prejudice Ravgen, as it will still have its day in court. And scheduling it for early next year avoids prejudice to Defendants by eliminating the need to spend resources in four separate trials defending against claims that were procured by inequitable conduct.

### IV. CONCLUSION

The evidence of inequitable conduct led Judge Klausner to schedule a bench trial on inequitable conduct before empanelling a jury. Judicial economy warrants doing the same here. Defendants respectfully request that the Court set trial on inequitable conduct for early next year.

Dated: July 31, 2023

| **MCCARTER & ENGLISH, LLP** | **RICHARDS, LAYTON & FINGER, P.A.** |
|---|---|
| */s/ Alexandra M. Joyce* | */s/ Christine D. Haynes* |
| Daniel M. Silver (#4758) | Frederick L. Cottrell, III (#2555) |
| Alexandra M. Joyce (#6423) | Christine D. Haynes (#4697) |
| Renaissance Centre | One Rodney Square |
| 405 N. King Street, 8th Floor | 920 North King Street |
| Wilmington, Delaware 19801 | Wilmington, DE 19801 (302( 651-7700 |
| (302) 984-6300 | cottrell@rlf.com |
| dsilver@mccarter.com | haynes@rlf.com |
| ajoyce@mccarter.com | |

*Counsel for Defendant Biora Therapeutics, Inc.*

*Counsel for Defendants Ariosa Diagnostics, Inc., Roche Sequencing Solutions, Inc., Roche Molecular Systems, Inc., and Foundation Medicine. Inc.*

**MORRIS, NICHOLS, ARSHT & TUNNELL, LLP**

*/s/ Jeremy A. Tigan*
Jack B. Blumenfeld (#1014)
Jeremy A. Tigan (#5239)
1201 North Market Street
P.O. Box 1347
Wilmington, DE 19899
(302) 658-9200
jblumenfeld@morrisnichols.com
jtigan@morrisnichols.com

*Counsel for Defendants Myriad Genetics, Inc. and Myriad Women's Health, Inc.*